## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LAURENCE LOVEJOY (#N-52404), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 17-cv-03674 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| JUSTIN HAMMERS, Warden, | ) | |
| Western Illinois Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

### MEMORANDUM OPINION AND ORDER

Petitioner Laurence Lovejoy, a prisoner at Western Illinois Correctional Center who is proceeding *pro se*, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his 2011 conviction for murder following his second trial in DuPage County, Illinois. For the reasons below, the Court denies the petition and declines to issue a certificate of appealability.

### BACKGROUND

In 2004, Lovejoy was charged with the murder of his sixteen-year-old stepdaughter, Erin Justice. (Dkt. No. 45-2.) Following his first trial, a jury convicted him of murder, found him eligible for the death penalty, and sentenced him to death. (Dkt. No. 45-7.) The Illinois Supreme Court vacated the judgment, however, upon determining that Lovejoy's defense had been prejudiced by a discovery violation involving the State's DNA expert. *Illinois v. Lovejoy*, 919 N.E.2d 843, 851–57 (Ill. 2009). The Illinois Supreme Court remanded the case for a new trial. *Id.*

Following a second trial, a jury again found Lovejoy guilty of murder and further concluded that the murder was committed in an exceptionally brutal manner. (Dkt. No. 45-18 at 788.) But the jury did not unanimously agree that Lovejoy should receive the death penalty. *Id.* at

925. Thus, he was sentenced to life imprisonment. (Dkt. No. 45-1.); *see also People v. Lovejoy*, 2013 IL App (2d) 110289, ¶ 2, 2013 WL 1932678, at *1 (Ill. App. Ct. May 8, 2013).

## I.    Fact Testimony at Lovejoy's Second Trial

The evidence at the second trial showed the following.[1] In the early part of 2004, Valerie Justice, her daughter Erin, and Lovejoy (who was Valerie's husband and Erin's stepfather) were living together in an apartment in Naperville, Illinois. (Dkt. No. 45-17 at 297–98.) On the evening of March 4, 2004, Erin appeared at the nearby apartment complex of her classmate, Ladarious Freeman. According to the trial testimony of Ladarious's mother, Lewanda Freeman, Ladarious let Erin into the apartment building after she repeatedly rang their buzzer, and she ran up the stairs to the Freemans' apartment wearing jeans and a t-shirt but no shoes, carrying a dog, and shouting "Ladarious, Ladarious, let me in, my stepfather just raped me." (Dkt. No. 45-17 at 36–39.) Lewanda let Erin into the apartment, where Erin sat on the kitchen floor, legs crossed, crying, and petting her dog until police arrived. (*Id.* at 41–43.)

Erin and a police officer together called Valerie. (Dkt. No. 45-17 at 309–10.) Sometime later, police transported Erin and her mother to a hospital, where medical personnel prepared a rape kit. (*Id.* at 72–73, 286–89.) Per protocol, a nurse swabbed the areas on Erin's body that she indicated the perpetrator had touched (her left breast and right cheek). (*Id.* at 246–47.) At the hospital, Erin prepared a written statement, in which she stated that Lovejoy kissed her face and breast and raped her vaginally. (*Id.* at 76–77, 81–86.) She was then discharged. Officers escorted her and Valerie to their apartment to gather items  and then to a Naperville hotel. (*Id.* at 78–79.)

---

[1] While the Illinois Supreme Court opinion following the first trial details the facts of the case, *see Lovejoy*, 919 N.E.2d 843, the appellate court's decision after the second trial does not. *Lovejoy*, 2013 IL App (2d) 110289. Like Respondent, *see* Dkt. No. 49, this Court's description of the facts of Lovejoy's second trial comes straight from the trial record.

Lovejoy was taken into custody that night. (*Id.* at 136.) He refused to provide a DNA sample voluntarily, but officers obtained a warrant and swabbed his mouth and penis. (*Id.* at 142–46.) Although an investigator recommended filing sexual assault charges against Lovejoy, the prosecutor preferred to wait for the results of the DNA analysis. (*Id.* at 208–09.) Lovejoy was released the next morning and ordered to have no contact with Erin. (*Id.* at 148–49.) Analysis of the swab from Erin's breast (completed after her death) showed it contained Lovejoy's DNA. (*Id.* at 829.)

Sometime before the sexual assault, Valerie had purchased a townhouse in Aurora, Illinois. She completed the closing just after the assault, and she and Erin moved in. (Dkt. No. 45-17, 321–22.) Because Lovejoy had been ordered to stay away from Erin, he was allowed to go to the townhouse only during afternoons, when Erin was at school, to look after a puppy. (*Id.* at 323–24.) Valerie left a key under an outside flower pot on the days Lovejoy visited. (*Id.* at 331.)

On March 26, 2004, a Friday and the night before Erin's murder, Valerie and Lovejoy discussed Lovejoy going to the townhouse the next day to pick up one of the dogs for a veterinarian appointment. (*Id.* at 338.) Valerie, who was working the following morning, asked Lovejoy to move the appointment from 10:00 a.m. to sometime later in the day to avoid contact with Erin, who was being picked up by her father, Frederick Justice, sometime between 9:00 and 10:00 a.m. Lovejoy told Valerie that he had already moved the vet appointment to noon or 12:30 p.m. (*Id.* at 338–39.) Later on Friday night, Frederick informed Valerie that he could not pick up Erin in the morning and asked Valerie to put Erin on a train Saturday afternoon. (*Id.* at 340–41.) Before going to bed on Friday night, Valerie and Erin planned that Valerie would call Erin from work at 9:00 a.m. to wake her and that Valerie would return home after work to drive Erin to the station. (*Id.* at 345.) At 7:48 a.m. on Saturday morning, Valerie called Lovejoy and left a message directing him

to move the veterinarian appointment to another day since Erin was going to be home until the afternoon. (*Id.* at 347–48.)

Valerie testified at trial that she began calling Erin at 9:00 a.m. on Saturday, but Erin did not answer. (*Id.* at 346–47.) Around 10:30 a.m., Valerie left work to check on Erin. (*Id.* at 350–54.) Valerie found Erin's naked body floating in a bathtub in an upstairs bathroom of their townhouse. (*Id.* at 354.) The tub was filled with bloody water, and blood covered every surface of the bathroom except the ceiling. (Dkt. No. 45-18 at 528–29.)

An autopsy later revealed that Erin's wrists had been slashed; her throat had been sliced multiple times; and she had cuts all about her body, including defensive wounds to her hands and arms. (*Id.* at 518–31.) She also had contusions to her face and head, along with bleeding under her scalp from repeated bludgeoning with a large, flat object, probably a frying pan. (*Id.* at 509–12.)

A pathologist testified at trial that Erin "died as a result of being beaten, poisoned, cut, and drowned." (*Id.* at 566.) Water in her lungs indicated that drowning was the immediate cause of death. (*Id.* at 536–37.) But had she not drowned, she would have died from blood loss, as well as an overdose of medication in her system. (*Id.* at 546–57, 568–69.) Her intestines, according to the pathologist, were stained a blue-green color consistent with the dye in liquid cold medicine. (*Id.* at 541–43.) Toxicology reports revealed that her blood contained: pseudoephedrine in an amount thirty-four times the toxic level; antihistamine three times the toxic level; dextromethorphan (cough suppressant) sixty times the toxic level; acetaminophen (Tylenol) five times the therapeutic level; and alcohol, a common ingredient in cough syrups. (*Id.* at 546–57.) The prosecution argued at trial that Lovejoy gave Erin lethal doses of cold medication and cut her wrists to simulate a suicide. (*Id.* at 670.)

4

Kayleen Steele, a neighbor who lived in the townhouse unit next to Valerie's, testified at trial that between 8:00 and 8:30 a.m., she heard two voices and sounds of bumping against the shared wall. (Dkt. No. 45-17 at 465–66.) After moving closer to the wall, she heard a male voice say, "so help me God," and a female voice say, "I'll just leave then. Let me go. I'll just leave." (*Id.* at 467–69.) Around 8:30 a.m., she heard a loud "thump" upstairs, thought someone might have fallen in her bathtub, and went upstairs to check on her husband. The noises then stopped. (*Id.* at 469–71.)

Valerie spoke to Lovejoy by phone later that day and asked him whether he had been to the townhouse that morning. (Dkt. No. 45-17 at 357.) Lovejoy responded, "let me tell you I did not do this and I didn't have anything to do with it." (*Id.* at 357.) He did not, however, answer if he had been by the townhouse that morning. (*Id.* at 357–58.)

The following day, police detectives located Lovejoy and interviewed him. The interview was videotaped and was played for the jury. (Dkt. No. 45-18 at 424–25); *Lovejoy*, 919 N.E.2d at 848–49.[2] In the video, Lovejoy "admitted that he went to the town house at approximately 7 a.m. on the day of the murder, but denied seeing or speaking to Erin." *Lovejoy*, 919 N.E.2d at 848–49. Lovejoy "could not account for his whereabouts after leaving the town house, other than to say he went to get coffee at a location he could not recall, and then drove around or sat in his parked car in locations he also could not recall." *Id.* at 849. He "could not explain why he went to the house at 7 a.m. when he knew the veterinary appointment was not until 12:30 p.m. [He] never went to the 12:30 p.m. appointment and did not call to cancel." *Id.*

---

[2] Although the video was played at trial, it was not transcribed by the court reporter and is not in the record submitted to this Court. It was, however, summarized by the Illinois Supreme Court in its ruling on direct appeal following Lovejoy's first trial.

Several days after Lovejoy was first interviewed by police officers, Valerie met him at a McDonald's. (Dkt. No. 45-17 at 358.) She asked him if he went to the townhouse on the morning of the murder. (*Id.* at 359.) He responded that he had. (*Id.*) He stated he went by to pick up one of the dogs for the vet appointment later that day and that he planned to knock on the door and have Erin let the dog into the yard, while Lovejoy waited in his van. (*Id.* at 359–60.)

## II.    Expert Testimony Regarding the Bloody Footprint

Three experts testified at both trials concerning a bloody footprint on a bathroom tile near Erin's body. The prosecution argued that the print was made by Lovejoy stepping on the tile with Erin's blood on the bottom on his foot. (Dkt. No. 45-18 at  689, 758–61.) Lovejoy's defense counsel argued that Lovejoy's footprint was made before the murder—possibly when he changed the showerhead in the bathroom—and that Erin's DNA came in contact with the pre-existing print. (*Id.* at 725–26.)

### A.    Dabney's and Keith's Testimony

Crime scene investigator Michael Dabney, the first of the three experts to examine the scene and the footprint, testified that he observed a ridge detail in blood on a bathroom tile next to the door. (Dkt. No. 45-17 at 538.) He applied leucro crystal violet (LCV)—a chemical spray that reacts with blood, turning bloodstains purple—to enhance the ridge impression. (*Id.* at 549, 553–54.) He then removed the tile for more analysis. (*Id.* at 554.)

Leroy Keith, a print expert, compared the ridge detail on the tile to a known footprint from Lovejoy. (Dkt. No. 45-19 at 148–49.) Keith determined that the impression on the tile "was made by the left foot of Laurence Lovejoy." (*Id.* at 149.) Keith further testified that the print was a "positive print," meaning that "the blood was on the bottom of Laurence Lovejoy's foot, on the top of the ridges, when his foot came in contact with the tile." (*Id.* at 150.) Keith explained that

the print was not a preexisting impression made visible by blood because fluid washing over a preexisting print would have obliterated it. (*Id.* at 202, 209–210.) "The pore structure, the ridge breaks," according to Keith, "were all visible. The extremely minute characteristics of that frictionary skin was visible, and that [occurs] only when the substance is on the ridges itself and is transferred in a positive form, just like a[n] ink stamp." (*Id.* at 210.)

The third witness to testify about the footprint was Tamara Camp, a DNA analyst. Her testimony at the first trial led to the discovery violation necessitating a second trial.

### B. Camp's Testimony at the First Trial

At Lovejoy's first trial, Camp testified that she conducted a tetramethylbenzadine (TMB) test, a more sensitive and more reliable presumptive test for blood than the LCV test, on the tile with the footprint. (Dkt. No. 45-5 at 31–34.) When she received the tile with the print, it had two different colored stains. One stain was reddish-brown and was where a metal threshold crossed the tile, separating the bathroom from the hallway. The other stain was dark purple and was in the uncovered part of the tile where the footprint was located. (*Id.*) The reddish-brown substance tested positive for blood. The dark-purple substance, however, did not. (*Id.* at 34.) Camp explained that the negative TMB result was "something you would expect to see" in an area previously treated with LCV "[b]ecause both tests have the same chemical reaction," and "perhaps the [LCV] catalyzed all of the hem[e] and therefore there was none left which would be able to react to the TMB test." (*Id.* at 34–35.) She thus opined that the dark-purple substance was "apparent blood." (*Id.* at 45–46.)

Defense counsel objected to this testimony, arguing that Camp's opinion was not in her report and that the State's failure to disclose the opinion constituted a discovery violation. (*Id.* at 103–04.) ("We were in fact led to understand by the written discovery we were given that her

7

opinion would be that there was no possibility, presence of blood in that 4 spot because of her negative test."). The trial court refused Lovejoy's requests to call an expert to rebut Camp's explanation for the negative TMB test, even after his attorneys informed the court that a rebuttal expert was ready to testify. (*Id.* at 117–20.) As noted above, Lovejoy's defense at the first trial, which Camp's negative TMB test supported, was "that the footprint found on the tile was a preexisting print that came in contact with a substance, other than blood, that contained Erin's DNA, such as skin cells or saliva. This argument would have had a basis in the evidence, as Valerie testified that defendant was previously in the bathroom when he changed the showerhead at her request." *Lovejoy*, 919 N.E.2d at 856.

On appeal, the Illinois Supreme Court held that the prosecutor erred by failing to disclose Camp's opinion that the purple substance on the tile was "apparent blood," and that the TMB result was a false negative. *Lovejoy*, 919 N.E.2d at 855–56. The Illinois Supreme Court further held that the trial judge abused her discretion when she refused Lovejoy's requests to call a rebuttal witness. *Id.* at 856–57. Accordingly, the state supreme court vacated the conviction and ordered a new trial. *Id.* at 868.

### C.    Camp's Testimony at the Second Trial

At Lovejoy's second trial, Camp conceded her prior testimony—that the tile's purple area was apparent blood and her TMB test was negative because the LCV test catalyzed all the heme— was incorrect. (Dkt. No. 45-18 at 175–77.) Contrary to her prior testimony, she explained, an LCV test could not have "consumed" the heme because a "catalyst [like heme] cannot be consumed." (*Id.* at 177.) Rather, it is "the other way around," *i.e.*, the heme in blood does not change, but instead, changes the LCV's chemical composition, turning the LCV purple. (*Id.* at 182.) Camp acknowledged she had no good explanation why her TCB was negative if blood was in the dark-

purple area. (*Id.* at 184–85.) She testified, however, that she still believed the dark-purple substance on the tile was blood based on photographs from the bathroom before the LCV test, the way the substance reacted to LCV, and her own tests. (*Id.* at 177.) Her DNA analysis of samples from the dark-purple and the reddish-brown areas revealed both contained Erin's DNA. (*Id.* at 163–66, 172–75.)

Before the second trial, Lovejoy retained a DNA expert. (Dkt. No. 45-16 at 240–42, 299–300.) Lovejoy's attorneys explained that the expert was only going to be used to counter Camp's testimony at the second trial if it was the same as her testimony at the first trial. (*Id.* at 375–76.) Because Camp acknowledged that her prior testimony about the reason for her negative TMB test was incorrect, Lovejoy's attorneys did not call the expert witness. (*Id.*)

### III.    Lovejoy's Removal from the Courtroom

Between the Illinois Supreme Court's remand for a second trial and the commencement of that trial, Lovejoy was removed from the courtroom for disruptive behavior on at least six occasions. (Dkt. No. 45-16 at 18, 38, 72, 288–89, 360–62, 426–27.) He was also removed from the courtroom for one afternoon of trial after repeated outbursts concerning Camp's testimony. (Dkt. No. 45-18 at 106, 121.) The outbursts occurred during a hearing outside the jury's presence to determine whether Camp could testify as an expert. (*Id.* at 101–21.) The trial judge twice warned Lovejoy that his interruptions would lead to him being barred from the courtroom that afternoon. (*Id.* at 106, 121.) When he again spoke, the trial court directed that he be removed. (*Id.* at 121.) Upon the jurors' return, the judge informed them that Lovejoy would be "absent from this

afternoon's proceedings" and instructed them, "[y]ou are not to infer anything from his absence, and you cannot consider his absence in any way in arriving at your verdict." (*Id.* at 133.)

At the close of evidence, Lovejoy argued, as he did at the first trial, that the evidence against him was largely circumstantial and that the only physical evidence was the footprint in the bathroom, which he asserted was on the tile before Erin's murder. (Dkt. No. 45-18 at 701–34.) The jury nonetheless found Lovejoy guilty of murder and eligible for a death sentence. (*Id.* at 788.) Following a sentencing hearing, the jury could not unanimously agree he should be sentenced to death. (*Id.* at 925.) So he was sentenced to life imprisonment. (Dkt. No. 45-1.)

### IV.     Lovejoy's Direct Appeals

On direct appeal following Lovejoy's first conviction, the Illinois Supreme Court addressed a number of issues. *People v. Lovejoy*, 919 N.E.2d 843 (Ill. 2009).[3] Of relevance to the instant § 2254 petition, that Illinois Supreme Court determined: (1) the discovery violation with respect to Camp's opinion about the dark-purple area on the tile being blood prejudiced Lovejoy and necessitated a new trial (*id.* at 851–58), and (2) introduction of Erin's statements about Lovejoy sexually assaulting her—solely for the purpose establishing motive—neither violated Lovejoy's Confrontation Clause rights, nor was so prejudicial to outweigh its probative value. (*Id.* at 862–66.)

In his second direct appeal, Lovejoy argued: (1) the trial judge's removal of Lovejoy for an afternoon of trial violated his Sixth Amendment Confrontation Clause right, and (2) the trial court should have held a pretrial hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), to determine the reliability of LCV testing as a presumptive test for blood. (Dkt. No. 45-

---

[3] In Illinois, "[a]ppeals from judgments of Circuit Courts imposing a sentence of death shall be directly to the Supreme Court as a matter of right." Ill. Const. art. VI, § 4(b).

20.) The Illinois appellate court denied both claims. *People v. Lovejoy*, 2013 IL App (2d) 110289, ¶¶ 18–39.

Lovejoy filed a petition for leave to appeal ("PLA") in the Illinois Supreme Court, again challenging his removal from the courtroom and the trial court's refusal to hold a *Frye* hearing. (Dkt. No. 45-25.) The Illinois supreme court denied the PLA. (Dkt. No. 45-26.) Lovejoy then petitioned the United States Supreme Court for a writ of certiorari, which was also denied. *Lovejoy v. Illinois*, 572 U.S. 1106 (2014).

### V.     State Post-conviction Proceedings

Lovejoy, proceeding *pro se*, asserted twenty-one claims in his post-conviction petition in the state trial court under 725 ILCS 5/122-1. (Dkt. No. 45-27.) The state trial court dismissed the petition at the first stage of post-conviction review as frivolous or patently without merit. (Dkt. No. 45-28.)

Lovejoy appealed, again representing himself. (Dkt. No. 45-31.) The Illinois Appellate Court affirmed the lower court's decision, noting that most of his appellate brief "fail[ed] to present a clear and coherent argument." (Dkt. No. 45-34 at 2.) The court "considered the merits of his appeal to the extent [it was] able to decipher his arguments." (*Id.*) As to the decipherable claims, the state appellate court held that they were procedurally barred from post-conviction review because: (1) they could have been, but were not, raised on direct appeal; (2) they were addressed on direct appeal and *res judicata* prevented further review; or (3) Lovejoy neither attached affidavits or other evidence supporting the claims, nor explained why he was unable to include such evidence. (*Id.* at 4.)

Lovejoy then filed a *pro se* PLA, which the Illinois Supreme Court denied. (Dkt. Nos. 45-35 and 45-36.) The instant petition for federal habeas relief followed.

11

## VI.     Lovejoy's § 2254 Petition

Lovejoy's § 2254 petition lists 27 claims, many of which are vague and include no supporting facts. As best this Court can discern, Lovejoy claims as follows:

(1)     the indictment was based on perjured testimony (no description of the testimony is given) (Dkt. No. 1 at 6);

(2)     Lovejoy is innocent, the prosecution suppressed evidence and used perjured testimony to convict him, and subsequently developed evidence proves the testimony against him was false (descriptions of the suppressed evidence, perjured testimony, and subsequently developed evidence are not provided), (*id.* at 7–8);

(3)     prosecutors suppressed evidence that would have impeached the State's DNA expert, Tamara Camp (*id.* at 9–11—pages 10 and 11 are out of order) (description of the evidence not provided);

(4)     Lovejoy received ineffective assistance of counsel because one of his attorneys divulged privileged client communications and another defense attorney attempted to cover it up (*id.* at 10–11) (information about the divulged communication unexplained);

(5)     Lovejoy's counsel on direct appeal "abandon[ed] all issues" because he "refused to file anything against his colleagues, who were representing [Lovejoy] at trial" (*id.* at 12) (no explanation of what appellate issues should have been raised);

(6)     Lovejoy was denied his right to be represented by an attorney of his choice because his prison refused to turn over legal materials and documents (*id.* at 13) (no description of what materials were needed to retain counsel);

(7)     the trial judge refused Lovejoy's requests to represent himself in violation of *Faretta v. California*, 422 U.S. 806 (1975) (*id.* at 13–14);

(8)     Illinois's death penalty scheme was unconstitutional, and the State seeking the death penalty resulted in "jurors who opposed the death penalty [being] excluded, which resulted in all jurors actually impaneled express[ing] strong support for the death penalty," and thus being "unduly prone to find [Lovejoy] guilty" (*id.* at 14–15);

(9)     Lovejoy was denied a forensic expert to refute the testimony of the State's forensic expert (*id.* at 16);

(10)    Lovejoy was denied his right to a fair trial when "a juror fell asleep . . . during critical DNA testimony" and not only missed testimony but also the ability to assess the witness's credibility (*id.* at 16–17);

(11)    Lovejoy's Confrontation Clause rights were violated when Erin's out-of-court statements to police and neighbors about Lovejoy sexually assaulting her three weeks before her murder were admitted at trial (*id.* at 17–18);

(12)    the trial court erred when it allowed Erin's out-of-court statements to be admitted under the forfeiture-by-wrongdoing exceptions to the hearsay rule and the Confrontation Clause because the prosecution never established that Lovejoy killed Erin to prevent her from testifying (*id.* at 18–19);

(13)    Lovejoy's Confrontation Clause right to be present at all critical stages of his criminal case was violated when the trial court removed him from the courtroom for an afternoon of trial when a key witness testified (*id.* at 19–22);

(14)    the State failed to prove every element of the offense beyond a reasonable doubt (*id.* at 22–23);

(15)    Lovejoy was denied his right to an expert to refute Camp's expert testimony, which Lovejoy contends was manufactured and false (*id.* at 23–27);

(16)    the prosecution knowingly suborned the use of perjury (*id.* at 27–28) (though Lovejoy presumably is referring to Camp's testimony, he does not indicate what part of her testimony was perjurious);

(17)    the trial court judge failed to correct the prosecutor's introduction of false, manufactured testimony from Camp (*id.* at 28–29);

(18)    "cumulative prejudice so infected the trial with unfairness as to make the resulting conviction a denial of due process of the Constitution" (*id.* at 29);

(19)    Lovejoy has "demonstrate[d] cumulative errors so substantial during the course of the trial that these errors so infected the jury's deliberations that they denied [him] a fundamentally fair trial" (*id.*);

(20)    the trial court judge erred when she denied Lovejoy's pretrial motion for a substitution of judge because Judge Creswell presided over the first trial and was biased  (*id.* at 29–31);

13

(21)     Judge Creswell erred by not granting Lovejoy's motion for substitution of the judge after his attorney engaged in an ex-parte discussion with the judge outside Lovejoy's presence (*id.* at 31);

(22)     Lovejoy satisfied the state-law requirement of demonstrating the "gist" of a constitutional violation to avoid dismissal of his state post-conviction petition at the first stage of review (*id.* at 32–33);

(23)     the state appellate court refused to consider Lovejoy's claims and denied him a fair direct appeal, and he was denied effective assistance of appellate counsel (*id.* at 34–39) (no mention if what appellate issues should have been raised);

(24)     the trial court judge erroneously denied Lovejoy's motion to dismiss after the prosecution concluded its case (*id.* at 40);

(25)     the trial court judge erroneously allowed the State to introduce into evidence a knife that was unrelated to the offense (*id.*);

(26)     the state appellate court refused Lovejoy's requests to have the entire record produced and instead decided his appeal on a less than complete record; the DuPage State's Attorney who participated in Lovejoy's prosecution was an appellate court judge when Lovejoy's appeal was being decided, and though that judge was not on the panel for Lovejoy's appeal, the panel was nonetheless biased against Lovejoy (*id.* at 41–44); and

(27)     the State knowingly failed to correct false testimony (*id.* at 44–46) (explanation of the testimony not provided).

## DISCUSSION

As explained below, none of Lovejoy's claims warrant § 2254 relief and all but four of them are procedurally defaulted.

### I.     Procedural Default

A § 2254 claim can be procedurally defaulted in two ways. The first occurs when a prisoner fails to exhaust state court remedies for the claim fully and the prisoner no longer has the ability to do so under the state's procedural laws. *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016). Pursuant to 28 U.S.C. § 2254(b)(1)(A), a state prisoner must "exhaust[ ] the remedies available in the courts of the State" before seeking federal habeas relief. He must "give the state courts a full

and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). "[W]hen the federal issue was not fairly presented to the state courts and those courts would now hold the claim procedurally barred, the procedural default doctrine precludes federal post-conviction review of the federal claim." *Thomas*, 822 F.3d at 384 (internal quotation marks and citation omitted).

The second type of procedural default "comes from the independent and adequate state ground doctrine." *Id.* at 384 (citing *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991)). Federal habeas review is precluded if "the state courts declined to address a petitioner's federal claims because [he] did not meet state procedural requirements." *Id.* at 384. "'A state law ground is independent when the court actually relied on the procedural bar as an independent basis for its disposition of the case.'" *Thompkins v. Pfister*, 698 F.3d 976, 986 (7th Cir. 2012) (internal citation omitted). "'A state law ground is adequate when it is a firmly established and regularly followed state practice at the time it is applied.'" *Id.*

### A.  State Court's Dismissal of Inadequately Briefed Claims

The state appellate court on post-conviction review found that most of Lovejoy's claims "fail[ed] to conform to the [briefing] requirements of [Illinois] Supreme Court Rules 341 . . . and 342" and "fail[ed] to present a clear and coherent argument." (Dkt. No. 45-34 at 2.) The state court considered the merits of Lovejoy's claims only "to the extent [it was] able to decipher his arguments" and considered all other claims "forfeited for failure to be clearly presented." *Id.*[4]

The state appellate court's denial of claims because Lovejoy inadequately briefed them results in those claims being both unexhausted and denied on independent and adequate state

---

[4] The Court agrees with Respondent that Lovejoy fails to satisfy the federal pleading requirements for Claims 1, 3, 4, 6, 17, and 27 in his § 2254 petition. *See* Rule 2(c) of the Rules Governing § 2254 Cases; *McFarland v. Scott*, 512 U.S. 849, 856 (1994). This Court often allows petitioners to submit an amended

procedural grounds. As stated above, for a claim to be exhausted, it "'must be fairly presented to the state courts' so that the state has a 'fair opportunity to consider' the issues." *Reynolds v. Hepp*, 902 F.3d 699, 705 (7th Cir. 2018) (quoting *Picard v. Connor*, 404 U.S. 270, 275–76 (1971)). Briefing issues in a manner that prevented the state appellate court from deciphering them, as Lovejoy did, was not a fair presentment of claims.

The state appellate court's denial of Lovejoy's inadequately briefed claims also relied on an independent and adequate state law ground. The state appellate court clearly relied on Illinois Supreme Court Rules 341 and 342 (as opposed to the claims' merits) to dismiss claims, and Illinois's briefing rules are regularly used by Illinois courts. "An issue not clearly defined or adequately presented may be deemed waived." *People v. Chaban*, 994 N.E.2d 1057, 1070 (Ill. App. Ct. 2013); *see also Spates v. Lashbrook*, No. 17 C 50010, 2017 WL 6623763, *5 (N.D. Ill. Dec. 27, 2017) (citing *People v. Johnson*, 898 N.E.2d 658, 680 (Ill. App. Ct. 2008) (collecting cases)).

Accordingly, all of Lovejoy's claims that were inadequately pleaded in his post-conviction appeal, which the state appellate court considered "forfeited for failure to be clearly presented," are both unexhausted and were denied on independent and adequate state procedural grounds. Those claims are procedurally defaulted from federal review. *See Thompkins*, 698 F.3d at 986. The following § 2254 claims fall into this category: Claims 1, 2, 3, 4, 5, 6, 8, 14, 18, 19, 23, 24, 26, and 27. The state appellate court did not address those claims either because they were inadequately briefed or because they were not presented to it. Either way results in default.

---

§ 2254 petition when their claims are insufficiently pled. Such is unnecessary in this case, however, since these claims are procedurally defaulted for the reasons stated above.

### B. Additional Claims Denied on Independent and Adequate State Law Grounds

As for Lovejoy's remaining § 2254 claims, the state appellate court dismissed five of them (Claims 7, 10, 20, 21, and 25) as waived because Lovejoy failed to raise them on direct review. (Dkt. No. 45-34 at 4.) "Under Illinois law, '[f]ailure to raise a claim which could have been addressed on direct appeal is a procedural default which results in a bar to consideration of the claim's merits in a post-conviction proceeding.'" *Sturgeon v. Chandler*, 552 F.3d 604, 611 (7th Cir. 2009) (quoting *Illinois v. Erickson*, 641 N.E.2d 455, 458 (Ill. 1994)). "A finding of waiver by the state post[-]conviction court is enough to establish an adequate and independent state ground." *Sturgeon*, 552 F.3d at 611; *Daniels v. Knight*, 476 F.3d 426, 431 (7th Cir. 2007). Claims 7, 10, 20, 21, and 25 are thus procedurally defaulted.

Claims 3, 9, 15, 16, 17 were dismissed by the state appellate because Lovejoy neither attached affidavits or evidence supporting them nor explained why such evidence was unavailable. (Dkt. No. 45-34 at 4–5) (citing 725 ILCS 5/122-2); *Illinois v. Collins*, 782 N.E.2d 195, 198 (Ill. 2002) ("the failure to either attach the necessary 'affidavits, records, or other evidence' or explain their absence is 'fatal' to a post-conviction petition") (citations omitted). "Illinois courts regularly enforce the affidavit rule," and the denial of claims based on the rule is an adequate state procedural ground independent of the claims' merits. *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016); *Thompkins*, 698 F.3d at 986–87.

For all the above stated reasons, the Court finds that Claims 1–10, 14–21, and 23–27 are procedurally defaulted.

### C. Lovejoy Fails to Demonstrate Either Exception to Procedural Default

Procedural default may be excused where a petitioner demonstrates "either (1) 'cause for the default and actual prejudice' or (2) 'that failure to consider the claims will result in a

fundamental miscarriage of justice.'" *Thomas*, 822 F.3d at 386 (quoting *Coleman*, 501 U.S. at 750). Lovejoy demonstrates neither.

To establish cause, the prisoner must "show that some objective factor external to the defense impeded [hi]s efforts to comply with the State's procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017). Lovejoy's reply to Respondent's answer states that his attorney on direct appeal was ineffective, and that Lovejoy was prevented from presenting claims on direct appeal because "the appellate court refused to consider [his] pro se brief." (Dkt. No. 59 at 21–29.) However, Lovejoy neither includes in his many exhibits a copy of his *pro se* appellate brief on direct appeal, nor does he state what issues he attempted to raise. (*See* Dkt. Nos. 1, 11, 59.) And even if Lovejoy were to submit a copy of his *pro se* appellate brief, it would not establish cause. Illinois courts regularly do not allow hybrid representation and may reject *pro se* pleadings when the party is represented by an attorney. *Clemons v. Pfister*, 845 F.3d 816, 819–20 (7th Cir. 2017); *McCorker v. Lashbrook*, No. 17 C 5613, 2018 WL 572833, at *4 (N.D. Ill. Jan. 26, 2018).

Although the state appellate court's refusal to address Lovejoy's brief does not establish cause to excuse his procedural default, ineffective assistance by appellate counsel for not raising claims can do so. *Martinez v. Ryan*, 566 U.S. 1, 11 (2012) ("[A]n attorney's errors during an appeal on direct review may provide cause to excuse a procedural default."). But while Lovejoy argues that his attorney on direct appeal provided ineffective assistance (Claim 23), he does not specify what issues the attorney failed to raise. (Dkt. No. 1 at 34–39; Dkt. No. 59 at 21–29.) This Court cannot fill in the gaps of Lovejoy's contentions. Additionally, an ineffective assistance of counsel claim asserted to excuse procedural default must, itself, be properly exhausted in the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 451, 453 (2000). Lovejoy does not meet this requirement as

he did not properly present his ineffective assistance of appellate counsel claim to the state courts. Lovejoy thus has not established cause with respect to his procedurally defaulted claims.

Nor has Lovejoy demonstrated that a fundamental miscarriage of justice would result if this Court does not review the defaulted claims. "The fundamental miscarriage of justice standard . . . applies only in the rare case where the petitioner can prove that he is actually innocent of the crime of which he has been convicted." *McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013) (citing *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). "A petitioner must have 'new reliable evidence . . . that was not presented at trial . . . and must persuade the district court that it is 'more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" *Jones*, 842 F.3d at 461. Lovejoy's pleadings in this Court allege several times that he is actually innocent, and he even asserts that "evidence which was subsequently developed" shows that the testimony against him was perjured and manufactured. (Dkt. No. 1 at 8.) But he points to no new evidence, such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," demonstrating his innocence. *Jones*, 842 F.3d at 461. Lovejoy's bald assertions of innocence do not satisfy the "extremely high bar" for demonstrating a fundamental miscarriage of justice. *McDowell*, 737 F.3d at 483.

In sum, Claims 1–10, 14–21, and 23–27 are procedurally defaulted and Lovejoy has demonstrated neither exception to excuse the default. Those claims are thus denied. The following claims remain: that Lovejoy's Confrontation Clause rights were violated when Erin's statements about the sexual assault were allowed at trial (Claims 11, 12) and when he was barred from the courtroom during an afternoon of trial (Claim 13), and that Lovejoy demonstrated the gist of a constitutional violation in his state post-conviction petition (Claim 22).

## II.      Admission of Evidence of Lovejoy's Alleged Sexual Assault

Lovejoy argues that the admission of Erin's out-of-court statements to officers and others about the alleged sexual assault violated his Confrontation Clause rights. The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; *see also Crawford v. Washington*, 541 U.S. 36, 51 (2004). Lovejoy contends that the trial court erroneously determined that the forfeiture-by-wrongdoing exception, wherein a defendant forfeits his Confrontation Clause rights if he killed a witness to prevent her from testifying, applied in Lovejoy's case (Claim 12), and that allowing Erin's statements about the sexual assault into evidence resulted in a Confrontation Clause violation (Claim 11).

Contrary to Lovejoy's contention, however, Erin's statements about the sexual assault were not admitted based on the forfeiture-by-wrongdoing exception to the Confrontation Clause. Although the state trial court held at one pretrial hearing that the exception applied, which would have allowed Erin's statements to be entered as substantive evidence (Dkt. No. 45-4 at 114–15), the evidence was actually admitted only to establish motive. At both trials, the jury was instructed:

> Evidence has been received that the defendant has been involved in an offense other than that charged in the indictment. This evidence has been received on the issue of the defendant's motive and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that offense and, if so, what weight should be given to this evidence on the issue of the defendant's motive.

(Dkt. No. 45-18 at 774) (second trial); *see also Lovejoy*, 919 N.E.2d at 865 (first trial). Claim 12 is contradicted by the record and thus denied.

Claim 11, Lovejoy's straightforward Confrontation Clause claim—that allowing trial witnesses to testify about Erin's statements concerning the sexual assault violated his Sixth Amendment right to confront witnesses—also warrants no federal habeas relief. The Illinois

20

Supreme Court on direct appeal following the first trial was the last reasoned state court decision to address the merits of that issue. *Lovejoy*, 919 N.E.2d at 865–66. The issue was not raised in Lovejoy's direct appeal following his second trial, and the state courts on post-conviction review refused to consider the claim on *res judicata* grounds based on the 2009 Illinois Supreme Court decision. When a state court refuses to address the merits of a claim based on *res judicata* because of a prior state court's resolution of the claim, federal habeas review looks to the earlier state court decision. *Sutherland v. Gaetz*, 581 F.3d 614, 616 (7th Cir. 2009). Although Lovejoy's conviction following the first trial was vacated, the state supreme court's holding in the first appeal applied in his second trial. *See Illinois v. Enis*, 645 N.E.2d 856, 864 (Ill. 1994) (collateral estoppel bars relitigation of issues that were decided in the first proceeding and that were not the reason for the remand); *Illinois v. Page*, 614 N.E.2d 1160, 1168 (Ill. 1993). This Court thus looks to the Illinois Supreme Court's decision following the first conviction.

The Illinois Supreme Court determined that, because Erin's statements about the sexual assault were admitted only for the purpose of establishing motive and not to prove the truth of her statements about the assault, Lovejoy's Confrontation Clause rights were not violated. *Lovejoy*, 919 N.E.2d at 866. Federal habeas relief is unavailable for "any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In this case, the Illinois Supreme Court cited the clearly established federal law applicable to Lovejoy's Confrontation Clause claim. *Lovejoy*, 919 N.E.2d at 866 (citing *Crawford v.*

*Washington*, 541 U.S. 36 (2004)). The state supreme court explained that, under *Crawford*, "it is a violation of the sixth amendment's confrontation clause to admit out-of-court testimonial statements of a witness unless the witness is unavailable for trial and there was a prior opportunity for cross-examination." *Lovejoy*, 919 N.E.2d at 865 (citing *Crawford*, 541 U.S. at 68). The Illinois Supreme Court further noted that, "[i]n *Crawford*, the [U.S.] Supreme Court explicitly stated that the confrontation clause does not bar the admission of testimonial statements that are admitted for purposes other than proving the truth of the matter asserted." *Id.* (citing *Crawford*, 541 U.S. at 59 n.9). The state supreme court thus concluded that, because "Erin's statements were admitted for the purpose of proving motive; not for the truth of the matter asserted," her statements were not barred by the Confrontation Clause. *Id.* at 866.

The Illinois Supreme Court's denial of Lovejoy's Confrontation Clause claim was neither contrary to nor an unreasonable application of clearly established U.S. Supreme Court precedent. As explained by the *Crawford* Court, the Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)); *see also Michigan v. Bryant*, 562 U.S. 344, 368 n.11 (2011)). Decisions of the U.S. Supreme Court thus support the Illinois Supreme Court's determination of this issue. The deference this Court must give to the state court's determination of a federal issue is extremely high. *Felton v. Bartow*, 926 F.3d 451, 464 (7th Cir. 2019). So long as this Court is "satisfied that the [state court] took the constitutional standard seriously and produce[d] an answer within the range of defensible positions," federal habeas relief is not available. The decision of the Illinois Supreme Court clearly falls within this standard. Federal habeas relief is thus unavailable for this claim. Claim 11 is denied.

### III.    Lovejoy's Removal from the Courtroom for One Afternoon of Trial

Lovejoy also claims that his removal from the courtroom for an afternoon of trial violated his due process right to be present at all critical stages of his case, as well as his right to confront witnesses. During pretrial proceedings after the case was remanded following reversal of the first conviction, the trial court removed Lovejoy from the courtroom at least six times. Each time, the trial court judge admonished Lovejoy that if he did not cease his disruptive behavior, he would be removed. (Dkt. No. 45-16 at 18, 38, 72, 288–89, 321–22, 526–27.)

On the third day of the second trial, the parties, outside the presence of the jury, addressed Tamara Camp being called as an expert witness. At the beginning of the hearing, the trial judge ruled that, even though Camp's prior testimony may have been incorrect, she could still testify as an expert given that she had conducted thousands of DNA tests. Lovejoy interjected, "[s]he could have committed perjury. . . . It's bogus, your honor." (Dkt. No. 45-18 at 106.) The judge admonished Lovejoy, "if you continue, you won't be here this afternoon." (*Id.*)

The hearing continued outside the jury's presence with defense counsel questioning Camp about her expertise. After Camp answered questions, the trial judge repeated her ruling that Camp could testify as an expert. Again, Lovejoy spoke up, and the following exchange occurred:

Lovejoy:      "I'd like to reissue a warrant for you to recuse yourself in this trial. I cannot receive a fair trial."

Trial judge:  "I'm telling you one more time. If you say one more thing, you're not coming back this afternoon."

Lovejoy:      "I'm not waiving my right."

Trial judge:  "You just did."

Lovejoy:      "I object."

(*Id.* at 121.) Lovejoy's attorneys asked the judge to reconsider, arguing (1) he had a constitutional right to be present at trial; (2) he had not been disruptive in front of the jury; and (3) he would be missing Camp's trial testimony, which the attorneys described as the "linchpin of the State's case." (*Id.* at 125–26, 129.) The trial judge refused to allow Lovejoy back into the courtroom, noting not only the above exchange but also the numerous other times he had been disruptive during pretrial proceedings. When the jurors returned, the trial judge informed them: "Mr. Lovejoy is absent from this afternoon's proceedings. You are not to infer anything from his absence, and you cannot consider his absence in any way in arriving at your verdict." (*Id.* at 133.)

On direct appeal, the state appellate court determined that Lovejoy's removal from the courtroom was neither an abuse of discretion nor a constitutional violation. The appellate court observed that "[a]n accused's right to be present in the courtroom during every stage of his trial is one of the most basic rights guaranteed by the confrontation clause." *Lovejoy*, 2013 IL App (2d) 110289, ¶ 19 (citing *Illinois v. Allen*, 397 U.S. 337, 338 (1970)). "Nonetheless, 'a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.'" *Lovejoy,* 2013 IL App (2d) 110289, ¶ 19 (quoting *Allen*, 397 U.S. at 343). The state appellate court considered the six occasions when Lovejoy was disruptive and removed before his trial and discussed in detail the above-quoted exchange just before he was removed from the courtroom on the third afternoon of trial. The appellate court concluded that "[t]he defendant's continued interruptions and disregard for the trial court is the type of behavior that courts have found sufficient to warrant removal." *Lovejoy*, 2013 IL App (2d) 110289, at ¶¶ 20– 27 (citing *United States v. Benabe*, 654 F.3d 753, 762–65 (7th Cir. 2011), and *Illinois v. Pearson*,

287 N.E.2d 715 (Ill. 1972)). The state appellate court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly established U.S. Supreme Court precedent. Nor was it an unreasonable determination of facts in light of the record.

The state appellate court properly applied U.S. Supreme Court precedent as set forth in *Illinois v. Allen*, which explains that an accused may lose his Sixth Amendment right to be present in the courtroom at every stage of his trial, "if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." 397 U.S. 337, 338 (1970). "[T]rial judges might choose to handle obstructive defendants with binding and gagging, contempt citations, or removal of the defendant, without treading on the Constitution." *Benabe*, 654 F.3d at 770. The *Allen* Court "did not make removal a last resort. Instead, the Court put its faith in trial courts to choose the best method to maintain the dignity and decorum of the proceedings in a case-by-case fashion, based on the unique circumstances presented by the defendant and the trial, while preserving the rights of criminal defendants." *Id.* (citing *Allen*, 397 U.S. at 344–46).

Given the state appellate court's citation to and application of *Allen*, 397 U.S. at 344–46, its consideration of the numerous times Lovejoy's disruptive conduct required his removal, and its detailed consideration of the exchange between him and the trial judge preceding his removal from the courtroom on the third day of trial, the state appellate court's decision, at minimum, "took the constitutional standard seriously and produce[d] an answer within the range of defensible positions." *Felton*, 926 F.3d at 464; § 2254(d). Claim 13 thus lacks merit and is denied.

IV.    **Claim 22 is Not Cognizable in a Federal Habeas Petition**

Lovejoy's Claim 22 asserts that the state trial court erred when it dismissed his post-conviction petition as frivolous or patently without merit under state law.[5] He contends he stated the gist of a constitutional claim sufficient to survive the first level of review under the Illinois Post-Conviction Hearing Act. *See* 722 ILCS 5/122-1.2(a)(2). This claim, however, is not cognizable in a § 2254 petition.

Under § 2254(a), federal courts may entertain a habeas petition by a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 670–68 (1991); *Brewer v. Aiken*, 935 F.2d 850, 855 (7th Cir. 1991) ("We do not sit as a super state supreme court to review error under state law.") (citation omitted). Whether the state post-conviction trial court "misapplied state law in determining if [petitioner had stated the gist of a constitutional claim] is plainly a question of state law." *United States ex rel. Scott v. Atchison*, No. 11 C 3442, 2012 WL 3234297, at *4 (N.D. Ill. Aug. 2, 2012) (quoting *United States ex rel. Anderson v. Hardy*, 779 F. Supp. 2d 816, 825 (N.D. Ill. 2011)). This Court cannot address whether the state trial court was correct when applying state law to dismiss Lovejoy's state post-conviction petition in the first stage of review. *See Bajdo v. Butler*, No. 11 C 1091, 2015 WL 1427786, at *7 (N.D. Ill. Mar. 24,

---

[5] Illinois's Post-Conviction Hearing Act provides for three stages of review in the state trial court. *See* 725 ILCS 5/122-1 *et seq*. At the first stage, the trial court may dismiss the petition if it is frivolous or patently without merit. § 5/122-2.1. If the petition survives this initial stage, it moves into the second stage, where the State is required to answer the petition and counsel is often appointed for the petitioner. If not dismissed at the second stage, the petition advances to the third stage, where the trial court conducts an evidentiary hearing. *See* § 5/122-5; *People v. Hodges*, 912 N.E.2d 1204, 1208 Ill. (2009) (to survive the first stage of review, the petitioner need only state the "gist" of a constitutional claim).

2015) (a § 2254 claim "challenging the application of [Illinois'] Post–Conviction Hearing Act . . . is not cognizable on federal habeas review"). Claim 22 is therefore denied as well.

### V.     Lovejoy's Challenges to Tamara Camp's Testimony

As addressed earlier in this opinion, Lovejoy's § 2254 claims about Tamara Camp's testimony are procedurally barred from federal review. The state appellate court refused to address those claims because: (1) Lovejoy failed to attach affidavits or other evidence demonstrating how her testimony was false, or (2) he could have raised the claims on direct appeal following his second trial but did not. This Court notes, however, as the state post-conviction trial stated, that many of Lovejoy's claims "are directly or indirectly related to the testimony of one of the State's witnesses, Tamara Camp." (Dkt. No. 45-28 at 2.) Even if this Court could address the merits of the claims, the post-conviction trial court's determination that "any alleged error relating to Ms. Camp's testimony in the first trial was remedied in the second trial" (*id.*), is well supported by the record.

Lovejoy's first conviction was vacated because Tamara Camp's testimony—that her TMB test's negative result for the presence of blood on the part of the tile with Lovejoy's footprint was a false negative—was not part of reports presented during discovery. Defense counsel objected: "We were in fact led to understand by the written discovery we were given that her opinion would be that there was no possibility, presence of blood in that 4 spot because of her negative test." (Dkt. No. 45-5 at 104.) The discovery violation and the trial court's refusal of defense counsel's requests to present Lovejoy's own expert rebutting Camp's testimony led to the Illinois Supreme Court vacating the conviction and remanding the matter for a new trial. *Lovejoy*, 919 N.E.2d at 855–58.

On remand, Lovejoy was able to, and did, retain his own expert. (Dkt. No. 45-16 at 240– 42.) He could have called his expert to testify at the second trial but chose not to do so given

Camp's acknowledgement that her testimony at the first trial was not entirely correct. (*Id.* at 375–76.) Lovejoy's trial attorney thoroughly cross-examined Camp about her prior testimony and about her still not having an explanation why her TMB test was negative if the tested substance on the tile was blood. (Dkt. No. 45-18 at 178–92.) Given Lovejoy's cross-examination of Camp at the second trial and his retaining of an expert to counter her testimony if needed, the state trial court's determination—that "any alleged error relating to Ms. Camp's testimony in the first trial was remedied in the second trial" (Dkt. No. 45-28 at 2)—was reasonable in light of the record. Even if this Court could reach the merits of Lovejoy's claims about Camp's testimony, federal habeas relief would be unavailable to him under § 2254(d).

## CONCLUSION

For all the reasons stated above, Lovejoy's § 2254 petition is denied. The denial of Lovejoy's petition is a final decision ending this case. If he seeks to appeal, he must file a notice of appeal in this Court within 30 days of when judgment is entered. Fed. R. App. P. 4(a)(1). He need not bring a motion to reconsider to preserve his appellate rights, but if he wishes the Court to reconsider its judgment, he may file a motion in accordance with Federal Rules of Civil Procedure 59(e) or 60(b). A Rule 59(e) motion must be filed within 28 days of entry of judgment and suspends the deadline for filing an appeal until the motion is ruled on. *See* Rule 59(e) and Fed. R. App. P. 4(a)(4)(A)(iv). A Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of judgment. *See* Rule 60(c)(1). A Rule 60(b) motion suspends the deadline for filing an appeal until the motion is ruled on only if the motion is filed within 28 days of the judgment. Fed. R. App. P. 4(a)(4)(A)(vi). The time to file a Rule 59(e) or 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). Finally, the Court declines to issue a certificate of appealability. *See* Rule 11

of the Rules Governing § 2254 Cases. Lovejoy cannot make a substantial showing of the denial

of a constitutional right and cannot show that reasonable jurists would debate, much less disagree,

with this Court's resolution of Lovejoy's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165

(7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

ENTERED:

Andrea R. Wood
United States District Judge

Date: December 30, 2020